**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Daniel Alexander Rodriguez,

               Petitioner,

v.

Stephen Morris, et al.,

               Respondents.

No. CV-19-04957-PHX-GMS

**ORDER**

Before the Court is a Report and Recommendation ("R&R") (Doc. 35) issued by Magistrate Judge Michelle H. Burns recommending that the Court grant Petitioner Daniel Alexander Rodriguez's ("Petitioner") Motion under 28 U.S.C. § 2254 challenging his convictions in the Maricopa County Superior Court, (Doc. 1). Respondents timely filed an objection to the R&R. (Doc. 36.) For the following reasons, the Court grants in part the Respondents' Objection, adopts in part and declines to adopt in part the R&R, and denies the Petitioner's Motion.

### BACKGROUND

As no party has objected to the procedural background set forth in the R&R, the Court adopts the background as set forth therein:

> Petitioner was indicted by an Arizona Grand Jury on February 24, 2014, on fourteen separate felony counts: two counts of Discharge of a Firearm at a Structure, class 2 dangerous felonies (counts one and eleven); four counts of Aggravated Assault, class 3 dangerous felonies (counts two, three, twelve and thirteen); one count of Aggravated Assault, a class 3

dangerous felony and a domestic violence offense (count fourteen); four counts of Disorderly Conduct, class 6 dangerous felonies (counts four through seven); one count Misconduct Involving Weapons, a class 4 felony (count eight); one count Forgery, a class 4 felony (count nine); and one count Taking Identity of Another, a class 4 felony (count ten). (Doc. 11, Exh. A.) Counts one through seven related to a shooting incident that occurred on January 31, 2014; and counts eleven through fourteen related to a shooting incident that occurred on February 14, 2014. (Id.)

Petitioner proceeded to trial, and was convicted of the lesser-included offense of Discharge of a Firearm at a non-residential structure (count one), the lesser-included offense of Disorderly Conduct (counts two and three), and as charged on the remaining counts. (Id., Exhs. L, N.) The jury further found counts one through seven, and ten through thirteen to be dangerous offenses. (Id.) On January 23, 2015, Petitioner was sentenced as a repetitive offender with two prior felony convictions to a total of 42.7[5] years in prison. (Id., Exh. N.) Petitioner appealed his judgment and sentence, and the Arizona Court of Appeals, in affirming, set forth the following factual background:

¶ 2 A grand jury indicted defendant on fourteen felony counts stemming from his behavior in several 2014 incidents. The first incident occurred during a fight between defendant and his then 16 year-old former girlfriend (A.G.). The two were riding in defendant's burgundy Mercury Montego when victim fled the vehicle. Defendant screamed at her repeatedly to get back in the car. Eventually defendant pulled a 9mm weapon out and shot multiple times in her general direction to get her "attention." Witnesses heard A.G. crying hysterically "let me just go home," heard the defendant yelling at her, heard the gun shots and heard his car speeding off. A.G. testified she was scared and had gotten back in the car. One of the witnesses found three bullet holes in and around his house. Two 9mm shell casings were found at the scene. This event is the factual basis for Counts 1- 7.

¶ 3 Counts 8 and 9 involve defendant using the identification of his brother N.R. Count 8 results from defendant presenting the false identification to an officer when that officer came into contact with defendant and A.G. during a loud fight in a parking lot days after the first shooting event. Count 9 results from defendant presenting N.R.'s identification to purchase the 9mm gun from a pawnshop. [Evidence showed that defendant used his brother's identification to buy both the 9mm gun and the burgundy Montego, as well as 9mm ammunition.] The false identification was found in defendant's

vehicle and A.G. was present both times it was used. ¶ 4 A couple of weeks after the first shooting, victim attempted to break up with defendant. Defendant texted her numerous threatening messages over two days. Those texts, as testified to and as recovered in defendant's phone, included: "tell your momma not to sleep on the couch cuz a bullet might hit her" and "Be ready ... I got 83 rounds" and "we both gonna die." [] A terrified A.G. called the police. Defendant then called A.G. and asked her to come outside, she refused; ten minutes later defendant fired multiple gunshots at her house. Approximately eight bullets travelled into the interior of A.G.'s house. A.G. provided police with a detailed description of defendant's car, including his license plate number, and advised them that defendant had a gun he'd recently purchased under a driver's license in N.R.'s name. This second shooting event is the basis for Counts 11-14.

¶ 5 After an active search for defendant, which included him driving from location to location, he was arrested later that same day while getting into his vehicle. He was taken into custody from the driver's seat. A protective sweep of the car was done at that time; officers knew that defendant was the suspect in a crime involving a gun and was potentially armed. The vehicle was then towed to the police substation while officers waited for a search warrant to issue. Police searched the vehicle pursuant to a search warrant in the early morning hours at the police substation. Inside the car officers found a 9mm bullet, two bullet shell casings, the sales receipt for the 9mm gun, and a cell phone containing the threatening texts. One shell casing and one live round were on the floor of the vehicle; another shell casing was in the trunk. Police testified that the shell in the interior of the vehicle was lodged under the carpet and took some rooting around to find.

(Doc. 11, Exh. S.)

In Petitioner's opening brief in the Arizona Court of Appeals, he raised the following issues: (1) unlawful search and seizure of Petitioner's vehicle after his arrest, and (2) the trial court improperly shifted the burden of proof onto Petitioner during the suppression hearing. (Id., Exh. P.) On March 15, 2016, the appellate court affirmed Petitioner's convictions and sentences, finding no error in the trial court's denial of his motion to suppress. (Id., Exh. S.) Petitioner filed a petition for review in the Arizona Supreme Court, claiming that the lower court erred in denying his claims regarding the search and seizure of his vehicle. (Id., Exh. T.) The Arizona Supreme Court summarily denied review on September 15, 2016. (Id.,

Exh. U.)

On February 18, 2016, Petitioner filed a pro se notice of post-conviction relief ("PCR"), which his counsel moved to dismiss without prejudice as Petitioner's direct appeal was still pending. (Doc. 11, Exhs. V, X.) The trial court granted the motion. (Id., Exh. Y.) After the conclusion of direct review, on September 18, 2016, Petitioner filed a pro se notice of PCR, indicating that he was raising a claim of ineffective assistance of counsel ("IAC"), and was not requesting the appointment of counsel to represent him. (Id., Exh. [Z].) The trial court set a briefing schedule. (Id., Exh. AA.) Pursuant to a subsequent request by Petitioner, the trial court appointed advisory counsel to assist him. (Id., Exh. BB.) On November 14, 2016, Petitioner filed his PCR petition, raising the following claims:

A.) IAC: trial counsel.

1. Trial counsel's failure to object to prosecutor's improper voir dire question identifying one of the victims as a child.

2. Trial counsel's failure to object to the introduction of text messages.

3. Trial counsel's making prejudicial statements in front of the jury and failing to move for a mistrial.

4. Trial counsel's failure to impeach a law enforcement witness as to the suggestiveness of a photo line-up.

5. Trial counsel's failure to object to the prosecution's laptop being provided to the jury.

B.) Prosecutorial misconduct, by making improper remarks during voir dire, using "staged" testimony to introduce inadmissible evidence, and making improper statements to inflame the passions of the jury.

C.) Trial judge's abuse of discretion.

1. Trial court abused its discretion by not investigating jury panel for bias.

2. Trial court abused its discretion by overruling multiple hearsay objections by Petitioner's counsel.

3. Trial court abused its discretion by not declaring a mistrial after prosecutor made improper argument in closing statements.

4. The trial court was without jurisdiction to render judgment on count 10, as it did not allege the place of the continuing offense in count.

D.) IAC: appellate counsel - for not raising all of the above claims.

(Id., Exh. CC.)

The trial court denied Petitioner PCR relief, reasoning as follows:

The defendant failed to raise his claims of prosecutorial misconduct and abuse of discretion by the trial court in his direct appeal. Further, based on the allegations in the PCR request, the Court finds that defense counsel's performance did not fall below prevailing professional norms and that no deficient performance on the part of defense counsel

- 4 -

prejudiced Mr. Rodriguez's defense or rendered different trial results than would have been achieved through competent performance. The Court also does not find that Defendant has stated a colorable claim for abuse of discretion by the trial court. As to one specific issue raised in that regard, the court reporter recently filed an Affidavit of Correction indicating that a statement that had been attributed in the trial transcript to defense counsel was, in fact, defendant's statement. The correction makes clear why the Court did not address the defense attorney for making such comment, since the comment was not made by him. Accordingly, and for the other reasons stated in the State's response [it is ordered denying PCR relief].

(Doc. 11, Exh. FF.)

Petitioner filed a petition for review of that decision in the Arizona Court of Appeals. (Id., Exh. GG.) On January 4, 2018, the Court of Appeals granted review, but denied relief, holding that Petitioner had failed to meet his burden to show that the trial court abused its discretion in its denial of PCR relief. (Id., Exh. II.) Petitioner subsequently filed a petition for review of the appellate court decision in the Arizona Supreme Court. (Doc. 1 at 36-209.) The Arizona Supreme Court summarily denied review on August 24, 2018. (Id. at 211.)

Petitioner filed his habeas petition on August 13, 2019. In his petition, Petitioner asserts the following claims: (1) ineffective assistance of trial counsel, (2) ineffective assistance of appellate counsel, and (3) prosecutorial misconduct. (Doc. 1.)

(Doc. 35 at 1–6.)

## DISCUSSION

## I.      Standards of Review

A district judge may refer dispositive pretrial motions, and petitions for writ of habeas corpus, to a magistrate judge, who shall conduct appropriate proceedings and recommend dispositions. *Thomas v. Arn*, 474 U.S. 140, 141 (1985); *see also* 28 U.S.C. § 636(b)(1)(B); *Estate of Connors v. O'Connor*, 6 F.3d 656, 658 (9th Cir. 1993). Any party "may serve and file written objections" to a report and recommendation by a magistrate judge. 28 U.S.C. § 636(b)(1). "A judge of the court shall make a *de novo* determination of those portions of the report or specified findings or recommendations to which objection is made." *Id.* District courts, however, are not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Arn*, 474 U.S. at 149. A district judge

1   "may accept, reject, or modify, in whole or in part, the findings or recommendations made

2   by the magistrate [judge]." 28 U.S.C. § 636(b)(1). However, "while the statute does not

3   require the judge to review an issue de novo if no objections are filed, it does not preclude

4   further review by the district judge, sua sponte or at the request of a party, under a de novo

5   or any other standard." *Arn*, 474 U.S. at 154.

6   Further, a district court may review a magistrate judge's ruling on a "pretrial matter

7   not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). For non-dispositive

8   orders, a district court "must consider timely objections and modify or set aside any part

9   of the order that is clearly erroneous or is contrary to law." *Id.* The clearly erroneous

10  standard applies to findings of fact and the contrary to law standard applies to legal

11  conclusions. *See Wolpin v. Philip Morris Inc.*, 189 F.R.D. 418, 422 (C.D. Cal. 1999). "A

12  finding is 'clearly erroneous' when although there is evidence to support it, the reviewing

13  [body] on the entire evidence is left with the definite and firm conviction that a mistake has

14  been committed." *Concrete Pipe & Prods. of Cal. Inc. v. Constr. Laborers Pension Tr. for

15  S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S.

16  364, 395 (1948)). "An order is contrary to law when it fails to apply or misapplies relevant

17  statutes, case law, or rules of procedure." *Jadwin v. Cnty. of Kern*, No. CV-F-07-026

18  OWW/TAG, 2008 WL 4217742, at *1 (E.D. Cal. Sept. 11, 2008) (quoting *DeFazio v.

19  Wallis*, 459 F. Supp. 2d 159, 163 (E.D.N.Y. 2006)). In reviewing a non-dispositive pretrial

20  order, in no event may the district court "simply substitute its judgment for that of the

21  deciding court." *Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 241 (9th Cir.

22  1991).

23  **II.    Prosecutorial Misconduct & Ineffective Assistance of Appellate Counsel**

24          **A. Legal Standard**

25  The writ of habeas corpus affords relief to persons in custody in violation of the

26  Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c)(3) (2006). Review

27  of Petitions for Habeas Corpus is governed by the Antiterrorism and Effective Death

28  Penalty Act of 1996 ("AEDPA"). *Id.*; 28 U.S.C. § 2244 et seq.

1

### 1.  Procedural Default & Exhaustion

A petitioner is required to exhaust his claims in state court before bringing them in a federal habeas action. 28 U.S.C. § 2254(b)(1)(A). In this context, exhaustion requires a petitioner to "give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In Arizona, a petitioner is required to "fairly present" all claims he seeks to assert in his habeas proceeding first to the Arizona Court of Appeals either through direct appeal or the state's post-conviction relief proceedings. *See id.* at 848; *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999).

For a petitioner to have fairly presented his claims to the appropriate state courts, he must have described the operative facts and the federal legal theory that support his claim. *See Baldwin v. Reese*, 541 U.S. 27, 29, 31 (2004); *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009) (per curiam). The petitioner must alert the state court to the federal nature of the right he claims, and broad appeals to "due process" and similar concepts are insufficient. *See Johnson v. Zenon*, 88 F.3d 828, 830–31 (9th Cir. 1996) ("While he did assert that the admission of the prior act evidence 'infringed on his right to present a defense and receive a fair trial,' the assertion was made in the course of arguing that the evidentiary error was not harmless under state law. Because Johnson never apprised the state court of the federal nature of his claim, he has not satisfied the fair presentation prong of the exhaustion requirement."); *Hivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("[G]eneral appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion.").

If a petitioner has failed to "fairly present" his federal claims to the state courts—and has therefore failed to fulfill AEDPA's exhaustion requirement—the habeas court must determine whether state remedies are still available for the petitioner; if not, those claims are procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). A petitioner can suffer a procedural default if the state court rejected the claim not on the merits, but because the petitioner failed to comply with a procedural rule. "A state court's

invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *see also Coleman*, 501 U.S. at 729–30 ("The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds."). Arizona has several rules that petitioners must follow when they seek to present claims in post-conviction relief proceedings; failure to comply with those rules results in a procedural default. *See, e.g.*, Ariz. R. Crim. P. 32.2(a). For example, if a petitioner seeks to bring a claim for the first time in a post-conviction relief proceeding that was available on appeal, the court can find the claim barred because a petitioner cannot bring claims in collateral proceedings that were available on appeal. *See id.* 32.2(a)(1). When the state court invokes that procedural rule, its judgment rests on a provision of state law that is both adequate and independent of the merits. Thus, a court in a federal habeas proceeding will accept the state court's procedural ruling and find the petitioner's claim defaulted. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (upholding reliance on Arizona's Rule 32 as an adequate and independent state ground).

Still, a petitioner can overcome a procedural default. A habeas court will consider claims the petitioner has procedurally defaulted only if he can demonstrate (1) cause for his failure to comply with state rules and actual prejudice or, in the very rare instance, (2) that a miscarriage of justice would occur. *See Dretke v. Haley*, 541 U.S. 386, 388–89 (2004). "Cause" means "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). It can include a claim that petitioner's counsel provided ineffective assistance that caused the default. *Id.* at 488–89. But that ineffective assistance of counsel claim itself must have been properly presented to the state courts for it to serve as cause to excuse a procedural default. *Id.* Even if a petitioner demonstrates cause for a procedural default, he

must nevertheless show "prejudice" or that the supposed constitutional error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Finally, a miscarriage of justice is shorthand for a situation "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke*, 541 U.S. at 393 (quoting *Murray*, 477 U.S. at 496).

## 2.  State Court Decision on the Merits

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" Supreme Court precedent if "the state court confront[ed] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[d] at a result different from [Supreme Court] precedent." *Vlasak v. Super. Ct. of Cal. ex rel. Cnty. of Los Angeles*, 329 F.3d 683, 687 (9th Cir. 2003) (alterations in original). A decision is an "unreasonable application" if "the state court identified the correct legal principles, but applied those principles to the facts of [the] case in a way that was not only incorrect or clearly erroneous, but objectively unreasonable." *Id.* It is not enough that independent review of the legal question leaves a court with "a firm conviction that the state court decision was erroneous." *Id.*

In habeas review, the Court must begin by applying a presumption, subject to rebuttal, that a state court adjudicated all claims presented to the state court on the merits. *Johnson v. Williams,* 568 U.S. 289, 293 (2013). Thus, if a federal claim was presented to the state court and the state court denied all relief without specifically addressing the federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991)). When the last reasoned state decision agrees with and substantially incorporates the reasoning from a previous state court decision, courts may consider both decisions to fully understand the reasoning of the last decision. *See Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir. 2014).

### B. Analysis

#### 1. Procedural Posture

Plaintiff's Petition for Habeas Corpus seeks relief for four wrongs: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel ("IAAC"); (3) prosecutorial misconduct; and (4) abuse of discretion of the trial court judge. Respondents object to the Magistrate Judge's conclusions concerning IAAC and prosecutorial misconduct.

First, Petitioner's IAAC claim has already been addressed on the merits. Petitioner raised IAAC in his PCR petition, asserting his appellate counsel was ineffective for not raising the cognizable claims contained in the petition. (Doc. 11-2 at 19.) The Arizona Court of Appeals wrote the last reasoned decision addressing the PCR petition and concluded that the trial court's decision denying the petition was not an abuse of discretion. (Doc. 1 at 33.) Thus, the trial court's opinion was impliedly incorporated into the Court of Appeal's reasoning. As the trial court explained:

> based on the allegations in the PCR request, the Court finds that defense counsel's performance did not fall below prevailing professional norms and that no deficient performance on the part of defense counsel prejudiced Mr. Rodriguez's defense or rendered different trial results than would have been achieved [by] competent performance. . .

> Accordingly, and for other reasons set forth in the State's response,

> IT IS HEREBY ORDERED summarily denying the Defendant's Petition for Post-Conviction Relief, filed November 21, 2016.

*Id.* at 28–29. The trial court's finding "that no deficient performance on the part of the defense counsel prejudiced" Petitioner necessarily reflects on the merits of Petitioner's

1    IAAC claim. If trial counsel's failure to object to the prosecutor's statements was non-

2    prejudicial to the Petitioner's defense, then the likelihood of success of the claims and the

3    severity of the wrongs must also be unlikely to constitute prejudice on appeal. Different

4    outcomes could only coexist if the trial court's finding of no prejudice, and the appellate

5    court's affirmation of that outcome, was a violation of clearly established federal law.

6         Moreover, although the trial court's explicit reasoning regarding ineffective

7    assistance of counsel seems to be principally directed at the performance of trial counsel,

8    the court also denied the petition for the "other reasons set forth in the state's response."

9    *Id.* The State's Response included an argument that appellate counsel's performance was

10   not constitutionally deficient:

> Defendant claims that appellate counsel was ineffective "for not raising the
> cognizable claims [in Defendant's petition] on direct appeal after notification
> of such." (Defendant's Petition at 13.) However, "[a] strong presumption
> exists that appellate counsel provided effective assistance. Appellate Counsel
> is responsible for reviewing the record and selecting the most promising issue
> to raise on appeal. As a general rule, '[a]ppellate counsel is not ineffective
> for selecting some issues and rejecting others.'" *State v. Bennet*, 213 Ariz.
> 562, 567, 146 P.3d 63, 68 (2006) (citations omitted). As noted in the letter
> sent by appellate counsel to Defendant, additional claims were not filed as a
> "strategic matter" because "[t]he case law [appellate counsel] found did not
> support the arguments."

18   (Doc. 11-2 at 47–48.) The trial court's incorporation of this argument demonstrates, under

19   the extremely deferential habeas standard, that it addressed the IAAC claim on the merits.

20   Petitioner is thus entitled to relief only if the trial court's decision was "contrary to, or

21   involved an unreasonable application of, clearly established Federal law, as determined by

22   the Supreme Court of the United States." 28 U.S.C. § 2254(d).[1]

23        Second, Petitioner's prosecutorial misconduct claim is procedurally defaulted. The

24   trial court found: "The Court agrees with the State's response that defendant fails to raise

---

[1] Petitioner contends that, because the State argued procedural default in its PCR Response instead of addressing the merits of prosecutorial misconduct, the trial court's reasoning cannot apply to the prosecutorial misconduct appeal. (Doc. 37 at 5.) This distinction overlooks the significant deference afforded to trial courts when determining whether an issue has been decided on the merits. *Johnson*, 568 U.S. at 293. Because the Response also contains explicit argument addressing IAAC, the trial court's opinion addresses the claim on the merits.

a colorable claim for relief. The defendant failed to raise his claims of prosecutorial misconduct and abuse of discretion by the trial court in his direct appeal." (Doc. 1 at 28.)

Petitioner alleges his appellate counsel's failure to raise the prosecutorial misconduct claims in his PCR petition on direct appeal amounted to ineffective assistance of counsel and constitutes cause to excuse the procedural default of his prosecutorial misconduct claim. An appellate counsel's failure to preserve an issue for appeal can establish cause to excuse procedural default if the failure was "so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). However, because the trial court has already addressed Petitioner's ineffective assistance of trial counsel and IAAC claim on the merits, Petitioner must establish that the trial court's rejection of these claims was "contrary to, or involved an unreasonable application of, clearly established Federal law" to establish cause to excuse his procedural default. 28 U.S.C. § 2254(d); *see Torres v. Ryan*, No. CV-17-08227-PCT-DJH, 2021 WL 512231, at *6 n.5 (D. Ariz. Feb. 11, 2021) ("[T]he Court also finds, as discussed infra, that the PCR court's dismissal of Petitioner's independent ineffective assistance of counsel claims was not 'an unreasonable application of[ ] clearly established Federal law[.]' . . .The fact that Petitioner's independent ineffective assistance of counsel claims lack merit underscores the conclusion that appellate counsel's conduct does not and cannot constitute cause to excuse Petitioner's procedural defaults."); *Scott v. Smith*, No. 3:10-CV-00754-LRH, 2011 WL 1882392, at *4 (D. Nev. May 16, 2011).

Thus, both of Petitioner's claims, IAAC and prosecutorial misconduct, turn on whether the trial court's denial of his IAAC claim was contrary to or involved an unreasonable application of federal law. To the extent that the IAAC claim relies on trial counsel's failure to object to the several instances of prosecutorial misconduct that occurred at trial, the PCR court has already considered and rejected the claim that trial counsel was ineffective at trial.  Thus, unless the PCR court's determination in this respect was an "unreasonable application of clearly established federal law," petitioner can neither establish prejudice sufficient to cure the procedural default on prosecutorial misconduct

1    issue, nor can he prevail on the merits of the IAAC claim.

2                            **2.  Prosecutorial Misconduct**

3           Petitioner alleges that the Prosecutor engaged in a number of instances of

4    misconduct during his closing argument at trial. This Court agrees with and accepts the

5    R&R's recommended finding in some particulars; the prosecutor at least somewhat

6    misstated the testimony of Celene Bensink in his closing argument. This Court, further,

7    accepts the R&R's conclusions that in his closing the prosecutor also committed

8    misconduct in:  (1) vouching for the victim's testimony by asserting she was not a liar; (2)

9    vouching for Detective Hiticas' testimony by inventing an explanation for the absence of

10   the gun used in the offense; and (3) burden shifting by referencing the undisputed nature

11   of the testimony where the Petitioner was the only eye-witness who could dispute the

12   victim's account of the incident. It, however, rejects the R&R's recommended finding that

13   the prosecutor committed misconduct in misstating the testimony of the Tindall family, in

14   misstating the testimony pertaining to the source of text messaging, in misstating the

15   evidence as it pertains to the Defendant's purchase of ammunition at the Walmart, or in

16   denigrating defense counsel.

17          In evaluating the PCR court's determination that the trial counsel's representation

18   was not ineffective, this Court examines whether the PCR court's conclusion violates any

19   "clearly established federal law." To assess the alleged misconduct, and the effectiveness

20   of trial counsel and the trial court in responding to it, this Court considers the nature of the

21   misconduct, whether an objection was made, the extent of any curative measures, and

22   whether, applying the appropriate deferential standard, the state PCR court accurately

23   determined that Petitioner received a fair trial and that there was no ineffective assistance

24   of either trial or appellate counsel. To conduct any of these inquiries, the Court must

25   examine the alleged misconduct at trial.

26                   **3.  Statements at Trial Which Did Not Rise to the Level of
                          Misconduct**

27                       **a.  Misstating the Testimony**

28   When considering a claim of prosecutorial misconduct, courts consider whether the

prosecutor manipulated or misstated the evidence. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). Prosecutors must not "base closing arguments on evidence not in the record." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989). They are however, "granted reasonable latitude to fashion closing arguments" and may "argue reasonable inferences from the evidence." *Id.* Petitioner asserts that the prosecutor misstated three types of evidence in closing arguments: (1) witness testimony; (2) the content and meaning of the text messages introduced as evidence; and (3) evidence that Petitioner purchased ammunition at Walmart.

### i.   The Tindalls

As no party has objected to the account of the Tindall's testimony set forth in the R&R, the Court adopts the description as set forth therein:

> Three other individuals who lived on a street near where the January incident took place, testified regarding their knowledge of the July 31st incident: Tammy Tindall and her 18-year old daughter Kiahra, and Tammy's boyfriend Damien Mitchell. (Doc. 23-1 at 818.) Tammy testified that she was awakened by the sound of a male and female arguing, and then heard around 4 gunshots. (Id. at 819-821.) She ran to check on her children and met her oldest, who had also heard the commotion, at her door. (Id.) She proceeded to check on the younger kids, but they had slept through it. (Id. at 821.) Kiahra Tindall testified that she was watching television when she heard an argument from the street between a male and female. (Id. at 831-32.) She heard the male voice command the female to get into the car, shortly thereafter heard 4 or 5 gunshots, then heard a car door slam and the car drive away. (Id. at 830-38.) Damien testified that he was asleep when he was awakened by an argument between a man and a woman, and heard the female indicate that she wanted to go home and the male telling her she was going to stay with him. (Id. at 808-810.) He then heard gunshots. (Id.) Within a few minutes, the County Sheriff Officers arrived and knocked on their door. (Id. at 811-12.) None of the three witnesses observed the individuals involved.

(Doc. 35 at 26.)

The prosecutor summarized the Tindalls' testimony and its effect in his closing argument. In doing so, he characterized their experience during the incident: "Damien Mitchell, Tammy Tindall, Kiahra Tindall running throughout the house, taking cover, checking to see if the kids, little children, are safe. Innocent victims." (Doc. 23-1 at 1487.)

He also repeatedly emphasized that the "whole Tindall family" corroborated the victim's testimony although only three members of the family testified at trial. *Id.* at 1533.

Trial Counsel did not object to the prosecutor's characterization of the Tindall's testimony. The Court finds these references fair inferences in light of the evidence presented. Tammy Tindall testified that she "flew" out of bed and checked on her children after being woken by the disturbance. *Id.* at 820. And characterization of similar testimonies as coming from "the Tyndall Family" where multiple family members testified, even if not the entire family, did not grossly misstate the evidence presented.

### ii.   Text Messages

The prosecution introduced two types of messages at trial: (1) text messages, some of which came from the Petitioner's phone and some of which were found only on the victim's phone but purported to be from the Petitioner; and (2) messages the victim received through an application called HeyWire. This second group of messages contained threats to the victim, and the victim testified she believed them to be from the Petitioner. They were not, however, located on Petitioner's cell phone. At trial, the prosecutor did not clearly distinguish between these two categories of messages. Petitioner argues that his discussion of the messages thus amounted to misrepresentations of the evidence to the jury.

During questioning, however, Detective Hiticas distinguished between the two types of messages:

> Q Just so we're clear, the text messages we saw on Athena's phone, were those lining up to the same text messages on Daniel's phone, and the data and everything, once you got all of that?
> A Correct. Anything that wasn't either erased or used through the text messaging application on the smart phones.

*Id.* at 1324. During closing arguments, the prosecutor referred back to the messages:

> [The victim] told you about the threats and the text messages. She told you about the phone call right before this happened, where he's telling her he's going to shoot up the house, essentially. She told you all about that, all of which is corroborated by her cell phone record and the text messages found on her phone, and also found and corroborated on the defendant's phone.

*Id.* at 1493–94. And later in the argument:

> Again, Athena's not lying about anything. Everything she's telling is the

truth and is corroborated by independent sources. The 2/14 shooting. Athena tells you about phone calls from the defendant. Those are corroborated by her phone and the defendant's phone. Detective Hiticase told you that he looked at both phones, and that they both matched up. Of course, there was some deleted text messages on the defendant's phone, but the ones that weren't deleted, everything matched up. The phone calls, the phone logs, the text messages.

*Id.* at 1501. Trial Counsel objected to the prosecutor's characterization of the text message testimony. The trial court overruled the objection, concluding that "[t]he jury will determine whether any of the argument correctly states what the evidence is." *Id.* at 1534. Regardless, although Petitioner is correct that not all the messages admitted into evidence were corroborated across multiple devices, the prosecutor's representations were a fair picture of the evidence. The prosecutor's ambiguous references to "messages" included those which were confirmed across devices. Although there were other messages that did not have this corroboration, the prosecutor made no explicit indication that he was referring to them. During the testimony, Detective Hiticas also clearly differentiated between the two methods of messaging. The prosecutor's representations were therefore reasonable inferences drawn from the evidence presented at trial and do not rise to the level of prosecutorial misconduct.

### iii.   Ammunition Purchase at Walmart

The prosecutor also summarized evidence that Petitioner may have purchased ammunition used in the offense at Walmart. Surveillance photographs were introduced at trial showing Petitioner and the victim entering and leaving the store. *Id.* at 1489. A receipt also showed ammunition was purchased during the time they were in the store. *Id.* at 1045–46. The victim likewise testified that they purchased ammunition that day, although there was no photo or video of them purchasing the ammunition. During closing arguments, the prosecutor interpreted this circumstantial evidence as direct proof that the Petitioner had purchased ammunition:

The purchase of the bullets, she said she told Detective Hiticase right after she got done buying the gun, they went to a Wal-Mart and bought bullets. Detective Hiticase then went and followed up on it, and you heard from the Wal-Mart security officer that came in and said, yeah, I was given a date and

time and I was able to narrow it down to a transaction around that time, and lo and behold we have a picture, and we have the security footage of the defendant and Athena buying the ammunition. So what Athena said is also, again, corroborated.

*Id.* at 1499. Trial Counsel did not object to the prosecutor's characterization of the Walmart footage. Although the surveillance footage did not specifically depict the sale, the prosecutor argued that the video shows Petitioner entering the store to purchase ammunition. Given the victim's testimony to this effect, and the receipt demonstrating that ammunition was purchased while the Petitioner was in the store, this was reasonable inference from the evidence presented to the jury. It does not rise to the level of prosecutorial misconduct.

**b. Denigration of Defense Counsel**

Prosecutors may not attack "the integrity of defense counsel" during closing arguments. *United States v. Nobari*, 574 F.3d 1065, 1079 (9th Cir. 2009). They may, however, undermine "the strength of the defense on the merits." *Id.* Courts thus distinguish between comments referring to the defense's argument and statements which amount to an ad hominem attack on defense counsel. *United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013) ("[T]he prosecutor's characterization of the defense's case as "smoke and mirrors" was not misconduct.").

Here, trial counsel objected to the prosecutor's comments on the defense. The statements, however, did not amount to personal attacks on defense counsel. The prosecutor asserted that defense counsel's arguments were a "red herring," "smoke and mirrors," and amounted to not presenting a defense. (Doc. 23-1 at 1529, 1531.) He also alleged that the arguments amounted to a plea to "just throw [evidence] out because it hurts my client" and represented "a common tactic to always attack the victim in a case." *Id.* at 1497, 1535. In perhaps the most personal attack, the prosecutor speculated about defense counsel's motive: "He's doing it because he's representing his client, of course. But what's the defense? There wasn't any." *Id.* at 1529. Because these statements attack the veracity of the defense, rather than defense counsel personally, they do not amount to denigration

of defense counsel. *See Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) ("Calling an argument on [the petitioner's] behalf 'trash' cannot be characterized as improper. He did not say the man was 'trash'; he said the argument was. A lawyer is entitled to characterize an argument with an epithet as well as a rebuttal."). The Ninth Circuit has found that several similar statements, even those implying misdirection from the defense, did not amount to misconduct. *See United States v. Palomo*, 714 F. App'x. 799, 800 (9th Cir. 2018) ("[T]he Government did not commit misconduct during rebuttal closing argument by describing a defense tactic as a 'shell game[;]'. . . criticizing defense tactics is fair game during closing, and this type of argument is generally considered 'well within normal bounds of advocacy.'"); *United States v. Salas*, 669 F. App'x. 449, 450 (9th Cir. 2016) (finding the prosecutor did not commit misconduct by calling defense's focus on sequence of events a "classic lawyer thing" designed to "muddy up the water" and show the jury a "red herring"). The comments thus do not amount to prosecutorial misconduct.

### 4. Statements at Trial Where the Prosecutor Engaged in Misconduct

#### a. Celene Bensink

As no party objected to the account of Celene Bensink's testimony set forth in the R&R, the Court adopts the description as set forth therein:

> Celene's testimony was consistent regarding her account of what she observed of the shooting incident on January 31st. (Doc. 23-1 at 656-702.) She was in her bedroom on the second floor of the house facing Cheryl Drive at 9:00 pm, when she heard an argument coming from the street. (Id. at 657-68.) When she went to the window, she observed a vehicle parked on the street in front of her house and heard an argument between a man and a woman. (Id.) She heard the man's voice growing loader (sic) and it sounded like he was yelling for the woman to get back into the vehicle. (Id.) It was dark, so Celene was unable to make out the model of the car, but described it as dark, "almost [] black" and "looking almost like a Mustang Coupe." (Id. at 658-61.) She did not see the woman, but testified that she thought the girl may have been located outside the car, perhaps hiding in bushes in the shadow of a brick fence. (Id. at 670-71.) She could not see the person in the vehicle either, but soon after going to the window she heard gunshots, "three "blue flashes" of gunfire, that she believed were fired in her direction. (Id. at 661-63.) At the same time, Celene determined that the man in the car was in the driver's seat, with his firing arm extended out the window. (Id. at 661-

63, 681) Celene immediately dropped to the floor to shield a young child and her dog from the gunfire. (Id. at 695-96.) She waited a few minutes after the gunfire, and then called 911. Celene did not see anything that happened after that, although she heard the car speed away. (Id.)

       The victim's testimony regarding this event differed from Celene's account in some important respects. She testified that on January 31st, she was with Petitioner in his car and were on their way home when they turned into the neighborhood of Cheryl Street, where she lived. (Doc. 11-2 at 236-41.) They were arguing before they parked the car on Cheryl Street, and after the car was parked, both of them got out of the car and continued to argue for about 5 to 10 minutes on the sidewalk. (Id. at 242-44.) She testified that Petitioner did not want her to go to her house, and then "started shooting in the air to kind of get [her] attention to listen to what he [] wanted." (Id. at [245-46].) They then got back into the car and took off again. (Id.)

       In his closing statement, the prosecutor emphasized several times that Celene's testimony corroborated the victim's. He stated that "Celene [] watched the whole thing go [], and watched as the defendant shot up the neighborhood." (Doc. 23-1 at 1486-87.)

(Doc. 35 at 23–25.) The prosecutor repeatedly emphasized that Celene witnessed the entire event:

> You know that Celene watched the whole thing. You have two eyewitnesses saying that man shot at the house. . . . You heard that from Celene who watched it all happen. You heard the same story from Athena of what happened out there.

(Doc. 23-1 at 1489–90.) He went on:

> "Celene, already told you, was the one who watched it all go down. All their stories jive." (Doc. 23-1 at 1500.) In addressing the proof that it was Petitioner who did the shooting, the prosecutor stated that the victim, Celene and all eyewitnesses saw his car drive away. (Id. at 1501-1502.) "Celene sees it all happening, says exactly the same thing [the victim] says happens." (Id.) The prosecutor then added that "Celene was watching the whole thing happen, and Celene knew that she wasn't really going to get shot because she's watching him shoot in a different direction, near her, but towards this house. She's not in fear because she knows what's going on, that she's not going to be getting shot at that point." (Id. at 1509.)

(Doc. 35 at 23–25.)

       The prosecutor overstated the strength of Celene's testimony to the extent he implied she identified the Petitioner. Celene never testified that she could see the shooter

- 19 -

clearly or that she had witnessed the entire incident. Rather, she explained that she was unable to see the Petitioner in the dark, and that, after hearing gunshots, she ducked down and did not see the vehicle drive away. She also provided a description of the vehicle based on her observation before shots were fired, stating that it appeared to be a dark-colored small vehicle which resembled a Mustang coupe. (Doc. 23-1 at 661.) The prosecutor's statements reach beyond Celene's testimony. Indeed, although Respondents suggest that the prosecutor also acknowledged that Celene did not witness the entire event or directly identify the Petitioner, the Court finds no such statement in the cited portion of the testimony. *Id.* at 1489–90. The prosecutor asserted only that Celene had no prejudice against Petitioner because "[s]he doesn't even know him." *Id.* at 1489.

The prosecutor's overstatements, however, do not establish reversible error. Trial counsel did not object to the prosecutor's statements about Celene's testimony. For a misrepresentation to be reversible, a prosecutor's misconduct must be so egregious that it infects the trial with such unfairness as to constitute a denial of due process before it violates the Fourteenth Amendment to the federal Constitution. *Donnelley v. DeChristoforo*, 416 U.S. 637, 643 (1974). The prosecutor's statements about Celene's testimony were not significant enough to render Petitioner's trial fundamentally unfair. Because the State had already presented evidence that the victim's testimony was corroborated, the prosecutor did not address any material issue not already within the jury's knowledge. Moreover, instructing the jury that lawyers' comments and argument are not evidence can cure the harmful effect of isolated instances of improper argument. *Sassounian v. Roe*, 230 F.3d 1097, 1106–07 (9th Cir. 2000). As the Court gave such an instruction here, the prosecutor's conduct was not reversible error.

### b. Vouching

"Improper vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Flores*, 802 F.3d 1028, 1040 (9th Cir. 2015). Petitioner asserts that the prosecutor vouched

for both the victim's and Detective Hiticas' testimony.

### i.   The Victim's Testimony

Here, the Prosecutor improperly vouched for the truthfulness of the victim. In his closing argument, he advised the jury:

> So, let's look at the credibility of [the victim], because we know maybe she's not the greatest high school female out there right now, but the one thing -- she might not be the ideal homecoming queen or something like that in high school, but the one thing that she isn't, she isn't a liar.

(Doc. 23-1 at 1497–98.) Later in his argument he stated again: "She may be an interesting individual, but she's not a liar." *Id.* at 1501.

These assurances of the victim's truthfulness were improper vouching. The Ninth Circuit has found similar affirmations improper, regardless of whether the prosecutor purported to express opinion or fact regarding the truthfulness of the victim. In *Carriger v. Stewart*, for example, the court found a prosecutor's statements that a witness "is not a liar" and "is a lot of things but he is not a liar" were improper vouching. 132 F.3d 463, 482 (9th Cir. 1997); *see United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (finding prosecutor's statements "I think he was very candid," and "I think he was honest" to be improper vouching for witness's credibility). The prosecutor thus improperly vouched for the veracity of the victim's testimony in his closing argument.

### ii.   Detective Hiticas' Testimony

The prosecutor also summarized Detective Hiticas' testimony. During closing arguments, he stated:

> But where's the gun, you may ask? The police looked for it. Detective Hiticase, just yesterday, or two days ago, testified they tried to track it down. They went knocking on doors, calling the phone numbers found on the phone, on the defendant's phone. No ones going to talk to them. Why? Why do you think any of these individuals are not going to talk to a detective about a gun they just bought, probably pretty cheap, on the street, from a guy you probably know, who probably went and told them what he did with it. They know that gun's hot. They know that it's got something on it. That's why they're buying it off the street for a couple hundred bucks. They're not going to talk to police.

(Doc. 23-1 at 1495.)

Earlier in the trial, the detective testified that he looked for the weapon used in the offense but was unable to locate it. *Id.* at 1378. A text message from Petitioner's phone, which the officer testified referred to selling a weapon, was also admitted. *Id.* In his closing argument, the prosecutor is clearly speculating about what the Petitioner may have said when selling the gun that would have contributed to the reluctance of purchasers to identify the seller when the detective sought to locate the weapon.  "Why do you think any of these individuals are not going to talk to a detective about a gun they just bought, probably pretty cheap, on the street, from a guy you probably know, who probably went and told them what he did with it."  Although, the prosecutor's speculation reaches beyond the evidence, it is speculative argument. These speculations are an argumentative attempt to bolster the Detective's conclusion that the Petitioner possessed the weapon and sold it.  But in light of the evidence admitted about the Petitioner selling a weapon, they do not amount to reversible error.

### iii.   Whether Vouching was Reversible Error

"There is 'no bright-line rule about when vouching will result in reversal.'" *Ruiz*, 710 F.3d at 1085 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993)). Courts consider several factors, including form, specificity, timing, the extent that the statement implies extrajudicial knowledge, degree of personal opinion asserted, the importance of the witness' testimony, and the form and timing of a curative instruction. *Id.* Trial counsel did not object to either instance of vouching.

When addressing comments on truthfulness, the Ninth Circuit has found that general instructions can cure vouching. For example, in a case of "mild" vouching, such as a simple assurance that a witness "is telling the truth," a general instruction at the end of a case may cure potential prejudice. *Necoechea*, 986 F.2d at 1280; *see United States v. Shaw*, 829 F.2d 714, 718 (9th Cir. 1987) (finding that a general instruction that the testimony of a recipient of a beneficiary plea agreement should be examined with caution cured any potential prejudice). As the prosecutor here twice asserted that the victim was not a liar, without further insinuation that he had special knowledge or power over her honesty, the trial

court's general instruction to the jury that closing arguments are not evidence was sufficient to cure any mild vouching.

The Ninth Circuit's multi-factor approach to vouching also demonstrates that the prosecutor's statements about Detective Hiticas' testimony were not fundamental error. The Court issued a general instruction that the closing arguments were not evidence, the statement did not explicitly express personal opinion, and the prosecutor's statements about the fate of the weapon were not repeated. Though repeated misrepresentation of evidence can demonstrate prejudice, generally, an isolated passage in an attorney's argument will not. *Donnelly*, 416 U.S. at 646. The vouching was thus not reversible error.

### c.  Burden Shifting

"It is well established that the privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's failure to testify." *United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir. 1988). A prosecutor comments on a defendant's silence when a statement is "manifestly intended to call attention to the defendant's failure to testify, or of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809–10 & n.1 (9th Cir. 1987) (prosecutor's statement that "there's only one person who could testify" was a comment on defendant's silence).

However, "[t]here is a distinction between a comment on the defendant's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify." *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995). "[A] comment on the failure of the defense as opposed to the defendant to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege." *United States v. Wasserteil*, 641 F.2d 704, 709–10 (9th Cir. 1981) (quoting *United States v. Dearden*, 546 F.2d 622, 625 (5th Cir. 1977)). Thus, to run afoul of the Fifth Amendment, a comment must contain "clear signals that the defendant himself, rather than the defense generally, was being discussed." *United States v. Mayans*, 17 F.3d 1174, 1185 (9th Cir. 1994). This standard of specificity is satisfied when a prosecutor

comments on a lack of contradictory testimony in a case where the only person who could provide such evidence is the defendant. *See United States v. Preston*, 873 F.3d 829, 843 (9th Cir. 2017) ("[I]t was plain error for the prosecutor to state that 'there's no testimony in this case that contradicts [the victim's] testimony,' because the jury would have immediately inferred that they did not hear testimony from [the defendant,] the only witness who could have directly contradicted [the victim's] allegations.").

Petitioner asserts several statements during closing arguments rose to the level of inappropriate comment on his silence. First, when introducing a theme that the evidence was undisputed, the prosecutor stated:

> He's guilty of all of these counts, ladies and gentlemen. He's guilty of all the charges. And at the end of the day, when you look at the State's case, and you look at all the evidence, the defendant doesn't have a burden at all, he doesn't have to present any evidence, and that's clear in your jury instructions. And that's what happened here in this case. But what also that tells you is that everything that the State put in front of you is undisputed. All the evidence that came from that stand, all the physical evidence, the pictures, the tangible items, the casings, all of that is undisputed. No one took that stand and said anything different than what Athena told you and what I told you in the opening statement what happened. The State's case is undisputed on what happened.

(Doc. 23-1 at 1511–12.) As the prosecutor continued in this vein, the court sustained defense objections:

> MR. RADEMACHER: Defense counsel got up here in his opening and talked to you about he takes issue with the State saying that its case is undisputed. Well, really what it is is his client takes issue with accepting responsibility. He takes issue with he's being prosecuted for a crime. Because what's undisputed here is what came from that stand, from the witnesses. No one came in here and disputed anything Athena told you. No one came in here and disputed anything any of the police officers told you. No one came in here and disputed anything any of the other civilian victims, our innocent victims told you.
>
> MR. CARTER: Judge, I'm going to object to improper argument. It's burden shifting. Period.
>
> THE COURT: Mr. Rademacher, I'm going to sustain that objection. I think there are different ways you can argue your point. But, ladies and gentlemen, the defense, as you know from the instructions, is not required to produce

any evidence, they're not, and that's in your instructions and that's clear. Whether or not any of the evidence that was present was disputed is up to you to determine based upon all the information that you receive, and counsel obviously have different opinions about that. With that, I'm going to ask Mr. Rademacher to proceed, please.

MR. RADEMACHER: What evidence contradicted what Athena told you happened?

MR. CARTER: Same objection, Judge.

MR. RADEMACHER: Talking about the evidence, Your Honor.

THE COURT: I'm going to overrule in this instance. Go ahead.

*Id.* at 1527–28.

These statements amount to inappropriate comment on Petitioner's silence. In a crime where only the victim identified Petitioner, the prosecutor repeatedly emphasized the lack of testimony disputing the victim's account. This was tantamount to referring to Petitioner's failure to testify and improperly shifted the burden to the Petitioner. *See Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) ("The prosecutor's statement that '[t]here's nothing different naturally and necessarily implicates [Defendant's] decision not to testify, as [Defendant] is the only person who could definitively answer the question of whether he used a knife.").

In response to the prosecutor's burden-shifting, trial counsel did timely object. However, even had he not done so, Ninth Circuit precedent still demonstrates that even where a prosecutor's burden-shifting statements during closing argument are improper, they are rendered harmless if a trial court responds with specific instruction to the jury. *See United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001). Here, in response to trial counsel's objection, the trial court issued a specific curative instruction regarding the prosecution's burden:

[L]adies and gentlemen, the defense, as you know from the instructions, is not required to produce any evidence, they're not, and that's in your instruction and that's clear. Whether or not any of the evidence that was present is disputed is up to you to determine based on all the information that

you receive, and counsel obviously have different opinions about that.

(Doc. 23-1 at 1528.) In evaluating whether the trial court's conclusion in the Rule 32 proceeding that Petitioner received a fair trial and effective assistance of counsel at trial, this instruction, issued pursuant to the Defense Counsel's objection and along with the other evidence presented at trial, was a sufficient basis on which the trial court may have appropriately concluded that the Defendant received a fair trial without violating clearly established federal law. In fact, because the wrong was cured by the trial court's curative instruction, to prevail Petitioner must establish, not just that prosecutorial misconduct occurred, but that the trial court's responses to that conduct, be it the curative instruction or its other responses to objections, were in error. Plaintiff makes no such showing.

### 5. Cumulative Wrongs

Because each instance of misconduct did not alone rise to the level of reversible error, they do not constitute violations of clearly established federal law. The R&R also considered, however, whether, taken together, the wrongs constitute a cumulative harm which was a violation of clearly established federal law. "[C]umulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . In simpler terms, where the combined effect of individually harmless errors renders a criminal defense 'far less persuasive that it might [otherwise] have been,' the resulting conviction violates due process." Nevertheless, this, too, is an issue upon which the PCR court ruled on the merits finding no prejudice arising from any prosecutorial misconduct and finding no ineffective assistance of counsel and no prejudice arising from such ineffective assistance.

In fact, although the Ninth Circuit in *Parle* found that it is "clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair," *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *Donnelly*, 416 U.S. at 643);[2] *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973),

---

[2] Although circuit courts are split on the issue, the Ninth Circuit reasoned that *Donnelly* clearly established that cumulative error analysis applies to due process violations. *Id.*; Ruth A. Moyer, *To Err Is Human; to Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May*

"the fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence.'" *Parle*, 505 F.3d at 928 (internal citations omitted). The court specified that an allegation of cumulative error is strongest where several errors undermine an already weak element of the state's case. *Id.* That is not the case here. Each error explained above goes to elements of the offense supported by other, properly argued, evidence. The only error which relates to an element the defense argued was unsupported, is the representation of Celene Bensink's testimony to suggest that she identified the Petitioner. Even to the extent that the representation occurred, however, the Petitioner was also identified via the testimony of the victim, the text messages between the victim and the Petitioner, and the contents of the Petitioner's vehicle when he was apprehended. Having reviewed all of the instances of such conduct complained of above, this Court cannot find that the state court's PCR determination on these issues was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. "[H]abeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter,* 562 U.S. 86, 102-03 (2011).

### 6.  Ineffective Assistance of Trial Counsel

To prevail on an ineffective assistance claim, the party seeking relief must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).

In his PCR Petition, Petitioner raised ineffective assistance of his trial counsel. The

---

*Cumulatively Assess Strickland Errors*, 61 Drake L. Rev. 447, 475 (2013) ("[T]he Supreme Court has not yet rendered cumulative analysis of an attorney's errors to determine *Strickland* prejudice as clearly established federal law."). Regardless, because Petitioner cannot establish that cumulative error occurred, he cannot succeed on the substance of his claim.

trial court concluded that "defense counsel's performance did not fall below prevailing professional norms and that no deficient performance on the part of defense counsel prejudiced Mr. Rodriguez's defense or rendered different trial results." (Doc. 1 at 28.) As explained above, this finding is entitled to deference; the Court may only reverse the state court's finding on the merits if it was a violation of clearly established federal law. The Court's review of the Petitioner's allegations of prosecutorial misconduct establishes that no such violation occurred. First, although the prosecutor engaged in burden shifting during closing arguments, trial counsel successfully objected to the statements and received a curative instruction. To the extent that Petitioner maintains he was prejudiced, he therefore alleges error by the trial court, not trial counsel. Moreover, as explained above, of the three remaining instances of misconduct, none constituted reversible error pursuant to clearly established federal law. Indeed, none are particularly egregious to notions of a fair trial, or, when combined with curative instructions, sufficiently egregious so that the trial court's evaluation meets the standard required for habeas relief. Petitioner thus cannot prove, under a standard deferential to the state's findings, that the result of the proceeding would have been different but for counsel's errors. The trial court's ruling on the PCR petition was therefore not a violation of clearly established law.

As a result, the trial court's finding that trial counsel's performance did not prejudice Petitioner undermines the merits of his prosecutorial misconduct and IAAC claims. The trial court's finding that counsel's failure to object to the prosecutor's statements was non-prejudicial to the Petitioner's defense must stand. This finding therefore controls this Court's analysis on his other claims.

### 7.  IAAC

Like ineffective assistance of trial counsel, Courts review claims of IAAC according to the standard set out in *Strickland*. A petitioner must show that (1) appellate counsel's advice fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. *Strickland*, 466 U.S. at 687.

First, there is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 687. Indeed, "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; . . . the weeding out of weaker issues is widely recognized as one of the hallmarks of effective advocacy." *Miller*, 882 F.2d at 1433. As a result, where counsel has filed a merits brief, it is difficult to demonstrate incompetence. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Nonetheless, "it is still possible to bring a Strickland claim based on counsel's failure to raise a particular claim." *Id.* Where ignored issues are clearly stronger than those presented, for example, the presumption of effective assistance can be overcome. *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Second, the salient question in analyzing a claim of ineffective assistance of appellate counsel is whether the unraised issue, if raised, would have "led to a reasonable probability of reversal." *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Thus, where a petitioner alleges that failure to a raise claim on appeal constitutes ineffective assistance, a finding of prejudice is a function of the strength of the underlying unraised claim. Where the underlying claim was unlikely to lead to a successful appeal, it cannot be the basis of a successful IAAC claim.

Here, none of the prosecutor's violations demonstrate that Petitioner's appellate counsel violated the *Strickland* standard by failing to raise prosecutorial misconduct on appeal. On direct appeal, counsel raised only the issue of suppression of an allegedly unconstitutional search. In a letter to Petitioner, counsel explained:

> As a strategic matter, I did not end up filing on the issue regarding juror taint or closing arguments we spoke about. The case law I found did not support the arguments. Because I didn't want to weaken your best argument with weak points, I elected to focus entirely on the suppression issue.
>
> Although it's a long shot, I hope we can get your case reversed.

(Doc. 29-1 at 114.) As explained above, of the four instances of misconduct, trial counsel objected to only burden-shifting. Under Arizona law, "[o]pposing counsel must timely

object to any erroneous or improper statements made during closing argument or waive his right to the objection, except for fundamental error." *State v. Smith*, 138 Ariz. 79, 83, 673 P.2d 17, 21 (1983). Thus, to successfully appeal where counsel fails to object during trial, a defendant must prove that the unobjected to event was so prejudicial that the Defendant was denied a fair trial. *Id.*; *see State v. Denny*, 119 Ariz. 131, 134, 579 P.2d 1101, 1104 (1978).

This standard, and Counsel's explanation, demonstrate that the failure to raise prosecutorial misconduct on direct appeal was a strategic decision entitled to deference. Indeed, the standards that apply to each instance of misconduct demonstrate that declining to raise the issues on direct appeal was not a violation of clearly established federal law. The Court is aware of no Supreme Court authority finding otherwise. In fact, the trial court's finding that trial counsel's performance did not prejudice Petitioner necessarily reflects on the merits of Petitioner's IAAC claim. The unobjected-to misconduct cannot establish prejudice for failure to raise the same claims on appeal. Thus, because appellate counsel's decision not to raise prosecutorial misconduct was not in violation of a clearly established federal law, neither Petitioner's IAAC claim nor his prosecutorial misconduct claim warrant habeas relief.

## III.   Order to Show Cause

In the R&R, the Magistrate Judge recommends "that Respondents be required to show cause as to why sanctions should not be imposed for their mishandling and misrepresenting of the record." (Doc. 35 at 40.) This recommendation was based on Respondents' numerous failures to clearly communicate with the Court and accurately represent the record in this matter. Most significant among these deficiencies was Respondents' failure to provide a complete record to the Magistrate Judge. In their initial Answer, Respondents filed a copy of the Petitioner's PCR petition that omitted the exhibits originally attached to the petition. (Doc. 11.) The Magistrate Judge directed respondents to file "the exhibits Petitioner indicates were attached to his PCR Petition." (Doc. 20.) Although Respondents assert in their Supplemental Answer that the attached exhibits

included the PCR exhibits ordered to be disclosed, they attached the wrong documents to the filing. (Doc 23.) After this failure was highlighted by Petitioner, Respondents initially misinterpreted the deficiency and filed a Notice regarding independently obtaining each exhibit referenced by Petitioner in his PCR petition. *See* (Doc. 36 at 7.) Ultimately, Respondents conceded that they had mistakenly attached the wrong documents and provided the correct exhibits to the court. (Doc. 29.)

The omission was an unprofessional error with the potential to prejudice the Petitioner. Petitioner repeatedly cites to the exhibits in his PCR petition and the Magistrate Judge explicitly requested that the omitted documents be filed. Respondents, however, even after failing for a second time to produce the attachments, continued to obfuscate the issue with notices regarding their efforts to obtain the trial exhibits referenced by Petitioner, rather than produce the requested attachments to his PCR petition. *See* (Doc. 36 at 7.) Significantly, the sought PCR attachments were relevant to the disposition of the Petitioner's claim. Respondents argued that Petitioner's limited references to prosecutorial misconduct in the PCR petition failed to raise the issue on appeal. (Doc. 23 at 2.) Petitioner asserted, however, that the attachments to his petition, which were repeatedly cited, also included an annotated transcript of the prosecution's closing argument which clearly identified instances of misconduct. (Doc. 28 at 2.) As the Respondents' arguments about the specificity of Petitioner's briefing are clearly undermined by the documents they repeatedly failed to produce to the Court, Respondents are ordered to show cause for why they should not be sanctioned for their failures to comply with the magistrate judge's orders.

## CONCLUSION

For the reasons set forth above, Petitioner's Petition for Writ of Habeas Corpus is denied.

**IT IS THEREFORE ORDERED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) is **DENIED.**

**IT IS FURTHER ORDERED** that the Court **ADOPTS** in part and **DECLINES**

to adopt in part the Report and Recommendation. (Doc. 35.)

**IT IS FURTHER ORDERED** that Respondents are ordered to show cause for why they should not be sanctioned for their failure to produce a complete record in this case within **14 days** of the filing of this order.

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court issues a Certificate of Appealability limited only to Petitioner's claim that ineffective assistance of appellate counsel violates a clearly established federal law and establishes cause for procedural default.

Dated this 17th day of May, 2021.

G. Murray Snow
Chief United States District Judge